IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DEBRA ORTEGA,

                    Plaintiff,

vs.                                                          CIVIL No. 02-1045 RLP

JO ANNE B. BARNHART,
Commissioner, Social Security,

                    Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Debra Ortega ("Plaintiff" herein), filed an application for Disability Income Benefits on March 24, 1999, alleging that she had become disabled as of January 18, 1999. (Tr. 113-115). After a hearing, an administrative law Judge ("ALJ" herein) concluded at step five of the five -part sequential evaluation process that Plaintiff could still perform limited sedentary work and therefore was not disabled. After considering additional materials the Appeals Council denied review, and the ALJ's decision became the Commissioner's final decision. Plaintiff asks this Court to reverse the Commissioner's decision and award benefits, or alternatively, to remand her claim to the Commissioner for additional proceedings. For the reasons stated herein, I find that Plaintiff's Motion is well taken, and Order that this matter be remanded to the Commissioner for additional proceedings.

I.        **Standard of Review**.

The Social Security Act provides that final decisions of the Commissioner shall be subject to judicial review. *42 0U.S.C. §405(g)*. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . ." *Id.* I review the Commissioner's decision to determine only whether the decision is supported by substantial evidence and whether correct legal standards were applied. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994).

Substantial evidence is more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable man might accept to support the conclusion. *Gossett v. Bowen,* 862 F.2d 802, 804 (10th Cir. 1988).   The determination of whether substantial evidence supports the Commissioner's decision is not a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes a mere conclusion. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).   I will not reweigh the evidence, but will examine the record as a whole, including whatever in the record fairly detracts from the weight of the Commissioner's decision in order to determine if the decision is supported by substantial evidence. *Glenn*, 21 F.3d at 984.

## II.    Factual Background.

Plaintiff was forty-five years old at the time of her administrative hearing.  She has a GED and vocational training as a patient service clerk.  She has significant scoliosis[1] and spina bifida occulta[2]. In addition, all of the toes of her left foot were amputated due to osteomylitis. Despite these medical problems she worked for twenty-two years as a unit clerk in a hospital.  Recognizing that Plaintiff has physical impairments that adversely impact on her residual functional capacity, this decision will focus on her mental impairment.

Plaintiff stopped working on January 18, 1999.   Her primary care physician diagnosed "marked" depression three days later (Tr. 214-215), and continued to consider her depressed and suffering from a panic disorder.  (210-214, 221, 226-227, 364, 281, 230, 291, 296).

---

[1]"Abnormal lateral and rotational curvature of the vertebral column." *Stedman's's Medical Dictionary,* 27th ed., 2000.  The extent of Plaintiff's scoliosis was described as "severe" by examining orthopedist Dr. Fredrick Sherman on November 30, 1988, and as marked by examining orthopedist Dr. Keith Harvie on April 27, 1999.  (Tr. 267, 178).

[2]Embryologic failure of fusion of one or more vertebral arches, without protrusion of the cord or its membrane, although often some abnormality in their development. *Id.*

Plaintiff was evaluated by Phillip Reed, a clinical and neuropsychologist, at the request her employer on March 31, 1999. (Tr. 210,164-167).   He documented problems with attention and concentration due to thought blocking, slow processing speed, impaired memory, depressed mood with flat affect and thoughts of hopelessness.  Dr. Reed diagnosed Major Depressive Disorder, single episode, moderate and Panic disorder with Agoraphobia, and stated that her cognitive disturbance was typical for depression and anxiety.  (Tr. 164-166).  Dr. Reed saw Plaintiff on one additional occasion, but she  was unable to afford continued care through him.  (Tr. 271, 312, 270, 309, 261, 285).

Anna Vigil, M.D., conducted a neurological examination on Plaintiff on July 9, 1999.  (Tr. 181-188).  Dr. Vigil's findings related primarily to Plaintiff's physical condition.  In terms of mental functioning, however, Dr. Vigil commented that Plaintiff suffered from significant depression, which was perhaps the primary barrier to her ability to work.  (Tr. 183).

Dr. Welker submitted a form to Plaintiff's disability insurance carrier on September 3, 1999, assessing Plaintiff with moderately severe to severe limitations in fifteen functional areas.[3]  (Tr. 285-289).  Dr. Welker attributed these limitations to depression and paranoia, and stated that unless Plaintiff received psychiatric help/counseling her prognosis was poor.  Plaintiff's mental condition, as evaluated by Dr. Welker, deteriorated over the next three months.  (Tr. 204,  302, 203).  Dr.

---

[3]Severe limitation:    Ability to relate to other people; restriction of daily activities, constriction of interests; ability to understand, carry out and remember instructions; respond appropriately to supervision; perform work requirement regular contact with others, perform tasks involving minimal intellectual effort; make independent judgments; supervise or manage others; perform under stress when confronted with emergency, critical, unusual or dangerous situations, situations in which working speed and sustained attention are make or break aspects of job.
Moderately severe limitation:    Deterioration of personal habits; perform work where contact with others will be minimal; perform repetitive tasks; perform varied tasks.
(Tr. 286).

Welker submitted a form to Plaintiff's disability insurance carrier on November 18, 1999, stating that Plaintiff suffered from panic disorder, agoraphobia and moderately severe major depression manifested by suicidal thoughts, flat affect, picking at her face to the extent she had caused facial lesions and had plucked out most of her eye brows, chest heaviness, and trouble getting up and leaving the house. (Tr. 229-232).  Dr. Welker stated that Plaintiff was unable to deal with the public, barely able to perform activities of daily living consistently, and only able to leave her house on a limited basis because of paranoia.  In terms of her prognosis, Dr. Welker stated Plaintiff would continue to deteriorate if she did not obtain counseling and that Plaintiff's mental condition precluded even sedentary work.  (Tr. 230, 232).  On April 13, 2000, Dr. Welker noted that Plaintiff had not kept regular appointments, hadn't gotten on a waiting list for psychiatric care[4], and  had developed a cellulitis from rubbing her eyebrow area.  Plaintiff stated that she had been taking her mother's antidepressant medication, because she could not afford to purchase her own.  Dr. Welker provided her with prescriptions and again  recommended exercise, regular diet and counseling.  (Tr. 298). Eleven days later Dr. Welker referred Plaintiff to the University of New Mexico Mental Health Hospital ("UNM-MHC" herein).  (Tr. 291).

Dr. Welker wrote to Plaintiff's disability insurance carrier on May 2, 2000, after reviewing a video tape the carrier had obtained of Plaintiff which showed her engaging in physical activities evincing greater ability than Dr. Welker had previously indicated Plaintiff could perform.  Dr. Welker stated:

> . . . After viewing the video tape . . .it is clear that (Plaintiff) is at least able, on an intermittent basis, to leave the house, drive, and go to the store without

---

[4]Plaintiff had been seen at the intake department of the University of New Mexico Mental Health Center on March 22, 2000, but no treatment was provided or scheduled.  (Tr. 241).

difficulty.  It appears that her orthopedic condition is currently not hindering her from work that does not involve long-term standing, stooping, or heavy lifting. . .

My concern. . . was her panic disorder, paranoia, and recently observed self-mutilating episodes.  She has not been able to afford psychiatric help.  She states that she is taking anti-anxiety and anti-depressant medications that I have prescribed regularly.  However, I have not refilled her Paxil in a long while.  She informs me she is taking her mother's prescription because she cannot afford to buy her own.  She has also not kept regular appointment with myself.  At her last visit with me on April 13th, she had what appeared to be large eschars across both eyebrow lines she states from over-rubbing them.  I feel she needs psychiatric help, but she had not put much effort forward, that I can see, into receiving it in the last year.  She states she cannot afford it, but she has not shown that she had made it a priority to get help and get better.

I, therefore, again recommend that (Plaintiff) pursue psychiatric counseling and agree with you that she can work full-time in a job that does not aggravate her orthopedic condition. . .

(Tr. 296).

Plaintiff was evaluated by Stacey Maggard, a licensed social worker at UNM-MHC on July 26, 2000.  (Tr. 243-244).  Ms. Maggard concluded that Plaintiff suffered from panic disorder with agoraphobia and depression. (Tr. 247, 259-261).

Plaintiff was seen by a physician and a 4th year medical student at UNM-MHC on  September 1, 2000.  She was  assessed as moderately ill and  advised to continue taking her anti-anxiety medication and to  increase the dosage of her anti-depressant. (Tr. 256-257).  Plaintiff began mental health counseling with Dr. H. Wood on October 10, 2000.   Dr. Wood diagnosed depression/dysthymia with some psychotic features.  (Tr. 280).  A month later, Dr. Wood diagnosed "double depression," chronic back pain, chronic illness behavior and heavy Axis II involvement[5]. (Tr. 277).  On the same day Dr. Wood  prepared  a functional capacity report for Plaintiff's disability

---

[5]Axis II  reports Personality Disorders and Mental Retardation,  and can be used for noting prominent maladaptive personality features and defense mechanisms.  *American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders, 4th Ed.,*  p. 26.

insurer, which is summarized in Appendix A.  On December 6, 2000, Dr. Wood again  diagnosed depression with chronic illness behavior and a strong Axis II component.

As of January 10, 2001, Plaintiff's treatment at UNM-MHC was transferred to  Dr. Malinda Marley.  (Tr. 274).  Dr. Marley noted depressed mood and dysphoric affect, circumstantial thought process, with good judgment and   fair insight.   At that time that Plaintiff had been off her antidepressant for a week and  had never taken anti-anxiety medication prescribed three months earlier.  Dr. Marley assessed Plaintiff as mildly ill and reinstituted  both medications.  By January 31, 2001,  Plaintiff's depression and anxiety had improved.  (Tr. 335)  Plaintiff missed two scheduled appointments in March 2001 (Tr. 334), and was next seen on March 22 with complaints of worsening panic attacks after running out of her antidepressant the week before.  (Tr. 333).    She again explained that she did not have the money to purchase medication. A mental status examination was performed[6] and she was assessed as fairly stable on her antidepressant, the dosage of which was increased due to mood symptoms.

Plaintiff returned to Dr. Marley on April 12, 2001, having been off her antidepressant for a month.  (Tr. 332, 324).   Her mental status exam had deteriorated[7], and she was assessed as moderately ill. (Tr. 332).   She had been given a five week supply of her antidepressant medication by her primary care doctor earlier that day (Tr. 332) and was advised to take that medication as well as an anti-anxiety medication.

---

[6]She was described as alert, well dressed and groomed, with normal speech, fairly euthymic affect, histrionic, with linear thought process, no suicidal or homicidal ideation, no hallucinations or delusions, good judgment and fair insight.

[7]She was described as alert, tired, held her head in her hands, speech normal, with tired mood, dysphoric affect, linear thought process, vague suicidal ideation with no plan or intent, no hallucinations or delusions, good judgment and fair insight.

Plaintiff was again evaluated by Dr. Marley on May 8, 2001, complaining of depression, fatigue, lethargy, headache, eyebrow and eye pain, lack of appetite, irritability and panic attacks in public. (Tr. 330). She was assessed as moderately ill with fairly well controlled panic attacks. A different antidepressant was prescribed, she was advised to continue using anti-anxiety medication and referred to a pain clinic to address chronic pain caused by spina bifida and scoliosis.

On May 17, 2001, Dr. Welker and Dr. Marley prepared medical assessments of Plaintiff's mental ability to do work related activities, a comparison of which is appended as Appendix B. Although Dr. Welker's assessment indicated greater levels of dysfunction, both assessments indicate Plaintiff mental abilities are seriously impaired.

## III.   Issues on Appeal

Plaintiff raises the following issues

A)   Whether the ALJ failed to apply correct legal principles and/or failed to support his determination at step three of the sequential evaluation process with substantial evidence. Plaintiff contends that the ALJ failed to provide the required analysis of Plaintiff's mental impairments, and that appropriate analysis would result in a finding of disabled under Listings §§12.04 (Affective Disorders) and/or 12.06 (Anxiety Related Disorders).

B)   Whether the ALJ's credibility determination was supported by substantial evidence.

C)   Whether the ALJ's assessment of Plaintiff's residual functional capacity was in error because the ALJ failed to consider all of Plaintiff's "severe" impairments.

D)   Whether the ALJ's determination at step five of the sequential evaluation process was based on an incomplete hypothetical question.

E)   Whether substantial evidence supports the ALJ's determination at step five of the sequential evaluation process. Plaintiff contends that her impairments preclude the performance of the duties of the jobs identified by the vocational expert, as those jobs are described in the Dictionary of Occupational Titles.

**IV.    The ALJ Failed to Apply Correct Legal Standards at Step Three of the Sequential Evaluation Process.**

The Commissioner uses a five-step process to determine the existence of a disability.  20 C.F.R. §404.1520; *Williams v. Bowen*, 844 F.2d 748, 750-752 (10th Cir. 1988) ( discussing the five steps in detail).  At the first step the Commissioner determines whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §404.1420(b).  In this case, Plaintiff has not engaged in substantial activity since her alleged date of onset of disability.  At step two the Commissioner determines whether the claimant has a severe impairment.  In this case, the ALJ found that Plaintiff suffered from severe impairments of lumbar scoliosis and major depression.  (Tr. 18).  He subsequently stated that Plaintiff suffered from depressive and panic disorders. (Tr. 21).  At step three the Commissioner determines whether the claimant's impairment meets or equals a listed impairment  20 C.F.R. §404.1520(d).  Such  impairments are considered so severe, that the ability to engage in substantial gainful activity is precluded. 20 C.F.R. § 404.1525(a); *Knipe v. Heckler,* 755 F.2d 141, 145-146 (10th Cir. 1985).

In evaluating claims at step three, the Commissioner is required to follow a specified procedure in determining the presence or absence of specified medical findings, the "Part A criteria," and to rate the severity of those findings, the "Part B criteria."  When there is evidence of a mental impairment, the ALJ, with or without the assistance of a medical advisor, must prepare  a Psychiatric Review Technique Form ("PRTF" herein) that tracks the listing requirements and evaluates the claimant under the Part A and B criteria, and that form must be attached to his decision.  *Cruse v. U.S. Dep't of Health & Human Servs,* 49 F.3d 614, 617 (10th Cir. 1995).

The ALJ erred at step three.  He referred generally to Listing sections 1.00 and 12.00 *et seq.*,

8

but did not identify by section number the specific listing sections he considered. (Tr. 18).  He did not prepare and append to his decision a PRTF, nor did he rate the degree of limitation of the four areas of functioning[8] considered at step three.  20 C.F.R. §404.1520a(c) &(d).

Plaintiff  contends that the evidence establishes that she does, indeed, meet the criteria for disability under Listing §§12.04 and 12.06.  Section 12.04 assesses prolonged mood disorders, including depression, and sets out a two-part test that must be met before a claimant may be found to suffer from a disabling mental disorder. The medical evidence establishes Plaintiff displayed more than the required four of nine criteria relevant to *per se* disability under Listing §12.04.  Dr. Reed diagnosed **anhedonia**.  (Tr. 164).  **Difficulty sleeping** was noted on numerous occasions by various physicians.  (Tr. 211, 313, 311, 208, 207, 306, 298 - Welker; Tr. 177 - Harvey; Tr. 241, 246-261, 256-7 - UNM-MHC).  **Decreased energy** was noted by UNM-MHC (Tr. 243, 261), while Drs. Welker, Reed and Marley noted that Plaintiff was tired or fatigued.  (Tr. 216, 164, 331, 330, 214). **Feelings of guilt or worthlessness** were noted when Plaintiff was evaluated at UNM-MHC on August 15, 2000.  (Tr. 261).   Three physicians noted that Plaintiff exhibited **difficulty in concentration**. (Tr. 134 - Reed; Tr. 313, 282, 285, 320, 354 - Welker; Tr. 344 - Marley). Plaintiff has had recurrent **thoughts of suicide**.  (Tr. 164, 285, 287, 243-244, 324, 332).

Listing §12.06 assesses anxiety related disorders including panic attacks.  The medical record clearly establishes that Plaintiff has a panic disorder.  (Tr. 214, 212, 211, 164-166, 281, 270, 287, 241, 296, 246, 324).

The second prongs of Listings §§12.04 and 12.06 are identical, requiring that the condition

---

[8]Activities of daily living; social functioning; concentration, persistence and pace, and episodes of deterioration.  20 C.F.R. §404.1520a(c) (3).

result in at least two of the following:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
>
> 4. Repeated episodes in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. § 404, Subpt. P, App. 1, § 12.04 B. The first two categories are rated on a five-point scale: none, slight, moderate, marked, and extreme. The third category is rated: never, seldom, often, frequent, and constant. Finally, the fourth category is scaled: never, once or twice, repeated, and continual. 20 C.F.R. § 404.1520a(b)(3) (1989).

Again, the ALJ did not assess the severity of Plaintiff depression or panic disorder on this scale.  The record contains a PRFT form prepared by a non-examining agency psychologist.  (Tr. 168-175). This form states that Plaintiff suffered from  major depression (12.04) and panic disorder (12.06) not expected to last twelve months.  (Tr. 168).  This PRTF was initially completed on April 1999, three months after Plaintiff's alleged date of onset of disability, and was adopted by a second reviewer on October 4, 1999, prior to any psychiatric evaluation or treatment at UNM-MHC.   As recognized by the ALJ, the opinions expressed in this form were clearly in error in predicting the duration of Plaintiff's mental disorders.  (Tr. 24).  Because this PRTF was based on a seriously incomplete medical record, it is of limited to no value.

This matter must be remanded to the Commissioner for preparation of a PRFT, the findings

of which are properly documented by citation to substantial evidence in the medical record.

Because this matter is reversed for additional proceedings at step three, I will not address the remainder of Plaintiff's claims of error.  Should additional proceedings involve a determination past step three of the sequential evaluation process, the Commissioner is directed to consider the extent to which Plaintiff's mental disorders and financial condition have impacted her ability to obtain medical care, and to reevaluate the evidence as it pertains to her credibility.

## V.    Conclusion

This matter is remanded to the Commissioner of Social Security for additional proceedings. The Commissioner shall reevaluate Plaintiff's claim at step three of the sequential evaluation process and shall prepare a Psychiatric Review Technique Form as required by the Commissioner's regulations, discussing and properly supporting the findings therein by citation to substantial evidence in the medical record.  Plaintiff shall be permitted to submit additional medical evidence related to the evaluation of listed impairments.  If the Commissioner is unable to decide this case in Plaintiff's favor at step three, the Commissioner shall conduct a supplemental administrative hearing addressing the remaining steps of the sequential evaluation process, in accordance with this opinion.

**Richard L. Puglisi**
**United States Magistrate Judge**
**(sitting by designation)**

11

**APPENDIX A**

Functional Capacities Evaluation Prepared by H. Wood M.D., 11/8/00
Tr. 276

Based on your evaluation of claimant's psychiatric status, please give your opinion as to the extent of the claimant's ability to doe the following of a sustained basis.

>**None:**   No impairment in this area
>**Mild:**   Suspected impairment of slight importance which does not affect functional ability.
>**Moderate:**   Impairment affects but does not preclude ability to function.
>**Moderately Severe:**   Impairment significantly affects ability to function.
>**Severe**:   Extreme impairment of ability to function.

| | No impairment | Mild impairment | Moderate impairment | Moderately Severe impairment | Severe impairment |
|---|---|---|---|---|---|
| Ability to relate to other | | | x | | |
| Restriction of ADLs | | x | | | |
| Deterioration of personal habits | | x | | | |
| Constriction of interest | | x | | | |
| Understand, carry out, and remember instructions | | x | | | |
| Respond appropriately to supervision | | | | x | |
| Perform work requiring reg. contact with others | | | x | | |
| Perform tasks where contact with other minimal | | x | | | |
| Perform tasks involving min. intellectual effort | x | | | | |
| Perform intellectually complex tasks req. higher levels of reasoning, math, language skills | | x | | | |
| Perform repetitive tasks | x | | | | |
| Perform varied  tasks | | x | | | |
| Make independent judgments | | | x | | |

12

**Appendix B**
**Comparison of**
**Medical Assessments of Debra Ortega's Ability To Do Work-Related Activities (Mental)**
**Prepared May 17, 2001**

Good - Ability to function in this area is limited to satisfactory.
Fair - Ability to function in this area is seriously limited, but not precluded.
Poor to None- No useful ability to function in this area.

| Function | Tina Welker, M.D. (Tr. 320-322) | Malinda Marley M.D. (Tr. 344-346) |
|---|---|---|
| Follow work rules | Fair | Good |
| Relate to co-workers | Fair | Fair |
| Deal with the public | Poor/none | Fair |
| Use Judgement | Fair | Good |
| Interact with supervisors | Fair | Fair |
| Deal with work stresses | Poor/none | Fair |
| Function independently | Fair | Good |
| Maintain attention/concentration | Poor/none | Fair |
| Medical/clinical findings that support assessment: | Pt has severe anxiety & depression. She is receiving counseling & medication from a psychiatrist at UNM. Over the last two years her hygiene has deceased, she intermittently has trouble leaving the house, she is having difficulty with housing and transportation.  She has trouble concentrating & completing processes secondary to pain and anxiety.  She has had trouble getting through bureaucratic systems to get and keep regular appointment due to the above | Pt cont. to c/o depressive symptoms & chronic pain symptoms |
| Understand, remember and carry out complex job instructions | Fair | Fair |
| Understand, remember and carry out detailed but not complex  job instructions | Fair | Good |
| Understand, remember and carry out simple job instructions | Fair | Fair |

13

| Function | Tina Welker, M.D. (Tr. 320-322) | Malinda Marley M.D. (Tr. 344-346) |
|---|---|---|
| Medical/clinical findings that support assessment: | Seems to comprehend thought/ideas in clinic but doesn't always follow through on tasks due to illness, inability . . . Poor memory. | Pt has not had formal neuropsych testing, however is having difficulties with concentration and attention as well as c/o mult. pain symptoms which may impair her ability to carry out job related tasks. |
| Maintain personal appearance | Poor/none | Good |
| Behave in an emotionally stable manner | Fair | Fair |
| Relate predictably in social situations | Poor/none | Fair |
| Demonstrate reliability | Poor/none | Fair |
| Medical/clinical findings that support assessment: | At recent visit patient is clean, however she has pulled out all of her eyebrows and had a mild cellulitis & scarring across brow area. Eyes are puffy. Pt can't afford office co-pay, but smell of cigarettes. Hasn't been consistent with follow up visits with specialists. | Again, because of depressive symptoms and chronic pain, may be limited in this area. |
| | Pt has back & foot pain, unable to wear regular shoes. Has come in last few visits wearing "beach" shoes. Unable to sit or stand long periods of time. However insurance comp. taped her 4/13/00 taking groceries up & down stairs at apartment without difficulty. So I am not sure the picture I see in the clinic is the "full" picture. | |

14